J. F. Daly, J.
The acts of the legislature upon which the defendants rely are, Laws of 1866, ch. 682, and Laws of 1867, ch. 375. By the first act it is made a misdemeanor for any person by act or neglect to “ maliciously kill, maim, wound, injure, torture or cruelly beat any horse, mule, ox, cattle, sheep or other animal.” By the last act it is made a misdemeanor to “overdrive, overload, torture, torment, deprive of necessary sustenance, or unnecessarily or cruelly beat or needlessly mutilate or kill, or cause or procure to be overdriven, overloaded, tortured, tormented or deprived of necessary sustenance, or to be unnecessarily or cruelly beaten, or needlessly mutilated or killed as aforesaid any living creature.” And by section 8 of the last mentioned act it is provided that “ Any agent of the American Society for the Prevention of Cruelty to Animals, upon being designated thereto by the sheriff of any county in this State may, within such county, make arrests and bring before any court or magistrate thereof, having jurisdiction, offenders found violating the provisions of this act.”
The relief demanded by the plaintiff is an order of this court restraining the defendants and its agents and employees from interfering with the plaintiff’s business in any way or manner whatever, or with its agents, employees, drivers, or superintendents of its stables, acting on behalf of plaintiffs, or engaged in their business; and from arresting, detaining or interfering with any of them; and from interfering in any manner with the plaintiffs’ horses, property, or appointments connected *60 with said lines of stages, and for such other and further relief as the court may deem proper; and the plaintiffs further ask judgment for damages.
So far as the jurisdiction of a court of equity to entertain an action of this nature is concerned, the objections of the defendants are not well taken. While bills have been filed usually to restrain the commission of trespasses against real property only, and precedents for such a remedy against mere personal trespasses are more difficult to find, yet where the trespasses, oft repeated and damaging, are committed against a franchise created and granted by the sovereign power, a court of equity will not hesitate to enjoin them. The reason of this is that the public at large have an interest in the protection of such rights and privileges as well as the parties particularly interested. The establishment of routes and conveniences for the carrying of passengers is highly necessary to the community, and any improper interference therewith will always be prevented by injunction. All invasions of franchises are the subjects of relief in equity (4 Johns. Ch., 150; Id., 48; Story Eq. Jur., 2, 108). No interference with the business and franchises of the plaintiffs, however, can be improper which results from the arrests contemplated by the aforesaid act of 1867, when made by the persons and in the cases prescribed by that act; and no injunction will issue to restrain the defendants or their agents from performing the duties they are required by that act to perform. The designation by the sheriff, provided for in section 8 of the act, constitutes an agent of the society an officer of the law, with the power of immediate arrest, in certain cases, without warrant, of offenders against the provisions of section 1 of that act. The enactment by the legislature is sufficient to confer this power, even if such agents did not become .by the designation aforesaid deputies of the sheriff to. that extent, he being ex officio a conservator *61 of the peace (10 Johns., 85). The powers thus conferred on the agents of the defendant are those of a constable at common law or of a police officer, so far as offenses against the said act are concerned. But such offenses are misdemeanors only, and the arrest cannot be made without warrant except where the offense is committed in the presence of the officer (2 Cush., 246, 615).
The legislature which creates the franchise enjoyed by the plaintiffs and the public, has the right to. impose-, certain general restrictions in the exercise of its duty to preserve the peace or to institute police regulations within constitutional limits. It had power to pass the act to punish the overloading or overdriving of horses, the tormenting or torturing them, or the cruelly beating, mutilating or killing of them needlessly ; in fact the whole act above quoted was within the scope of the legislative power, and it is no interference with the rights of plaintiffs to compel an observance of that act in the management of their franchises, and no inconvenience or loss arising from a willful violation of that act can be urged as a ground for restraining arrests by defendant’s agents for such violation (7 Wall. U. S., 487 ; 8 Pet. C. Ct., 390; 15 Abb. Pr., 201; 32 How. Pr., 184 ; 34 Id., 416 ; 10 Abb. Pr. N. S., 376). The only ground for injunction must be that interference with the plaintiff’s franchises is attempted by defendants’ agents in cases not within the provisions of the act, or in excess or abuse of the authority conferred by it. I have already said that the arrest without warrant can only be made where the offense is committed in presence of the designated officer who makes the arrest. This is not only the rule at common law but is the true interpretation of the statute itself, which provides for the arrest of persons “found violating the provisions of the act.” In a case where similar language is found in an enactment as to the arrest of persons “found violating ” the provisions of a municipal ordinance, the *62 general term of the supreme court of this State has held an arrest without warrant to be proper (Butolph v. Blust, 41 How. Pr., 481).
What then are the offenses committed in the presence of the officer which justify the arrest without warrant ? It appears from the affidavit of Hartfield, the general superintendent of the Society for the Prevention of Cruelty to Animals, that the complaints upon which the drivers of the plaintiffs’ stages were so arrested without warrant, were for driving horses which were lame, or suffering from disease : thus in one case a horse so driven had a large fissure in the anterior portion of the near hind hoof, another had a raw sore on each shoulder under the collar, another was badly foundered and sprung, another was so sick that be staggered and fell, another had a raw sore on the right breast, and a long cut or gash on the front of the fore leg, and a raw wound on the fetlock joint, another was lame in the left fore leg; all of these were complained of as offenses against the statute prohibiting the “torturing or tormenting ” of horses. Ho complaint seems to have been made against the plaintiffs for the over-driving, overloading, beating, mutilating, killing or depriving of necessary sustenance, of the horses drawing their vehicles. The theory of the defendant is that the driving of horses afflicted by disease or wounds in the manner described is a tormenting or torturing of the beast within the letter as well as the spirit of the statute, without regard to the intention or knowledge of the driver.
I am inclined to agree with the counsel for the defendants that the act of 1867 was passed to remedy a supposed defect in the common law,—i. e., that an arrest without warrant could not be made in the case of a misdemeanor committed in the presence of the officer unless it tended to a breach of the peace. The power of constables to arrest without warrant in cases of mis *63 demeanor appears to have been confined to acts committed in their presence which tended to a breach of the peace, and to affrays (1 Bish. Crim. Pro., § 460, and cases cited in notes). Bat in this State it is held that constables may arrest without warrant for any misdemeanor committed in their presence (17 How. Pr., 101). The courts of this State, as far back as 1822, and the courts of other States have decided that wanton cruelty to an animal,—e. g., excessive beating of his horse by a cartman,—or any deliberate cruelty to an animal, is a misdemeanor at common law (1 Wheel. Cr. Cas., 111; 3 City Hall Rec., 191 ; 1 Aiken [Vt.], 26; 7 Law Rep. N. S., 89, 90); so that even without the act of 1867, such arrests as are contemplated by it might be made by the proper officers without warrant. The act was designed evidently for the purpose: 1, of clothing the agents of the society with power to make such arrests; and, 2, to place beyond a doubt the criminality of the acts of cruelty to animals, as well as to more particularly define in what such cruelty consisted. My opinion is that as to the offenses themselves the act of 1867 was declaratory only of the common law.
The act in other words created in these respects no new offenses, but provided for the punishment of such as were indictable at common law, each of such acts of cruelty being malum in se. To constitute at common law the offense of cruelty, deliberation was necessary, as evidencing the wicked intent to inflict injury upon the animal. This was held in the case of People v. Ross, above cited (3 City Hall Rec., 191), where a car-man, intending to beat his horse for refusing to draw its load, struck it a single blow upon the neck, which killed it. He was acquitted on the ground that the evidence showed no deliberate intention to kill the animal, but only to chastise it. Under this act of 1867, certain of the offenses designated are by their commis *64 sion alone evidence of willful intent to commit the", misdemeanor—such as overloading or overdriving (10 Abb. Pr. N. S., 377), cruelly beating or needlessly mutilating or killing or depriving of necessary sustenance, any dumb animal (1 Aiken [Vt.], 226), and such also as tormenting or torturing such animal by cruel or unusual punishments or wanton injury done from wicked' motives. But it is clear that the mere fact of driving a sick, sore, lame, or disabled horse, is not, per se, the tormenting or torturing intended by the act. The driving of such a horse directly to its stable is not an offense, nor driving it for exercise, nor driving it carefully in a manner proportioned to its condition, where it has become disabled, lame, or sick, on the road. And whether a horse suffering from certain sores or disorders is injured or suffers torment or torture by being driven is in many cases such a question for the determination of medical experts as renders it exceedingly doubtful as a case of patent torturing or tormenting within the act.
Here, then, in the case of drivers arrested for driving diseased horses, arises the question as to how far such drivers are guilty of any offense if ignorant of the condition of the horses or inexpert in detecting those signs, familiar to veterinary surgeons, of suffering on the part of the animal. Upon indictment for offenses malum in se ignorance or mistake of fact is an excuse which is available to the prisoner as a defense (3 Green. Ev., § 21). As appears from the proofs, the drivers are not allowed to select the horses which they are to drive, nor can I see how they are to be bound to the same knowledge of the horse which a surgeon would possess, nor how they can be arraigned for tormenting or torturing the horse if they are driving it pursuant to their orders and are wholly ignorant of its physical condition. There is a vast difference between such an act in which their is neither motive, malice, nor wantonness *65 on the part of the driver, and those acts of cruelty which the legislature intended to punish, which evidence a savage and unfeeling heart and a willful disregard to the sufferings of the helpless brute. I am not surprised, with these difficulties surrounding this particular class of offenses, that “no convictions of plaintiffs’ drivers have ever been had ’ ’ as the plaintiffs allege and as is not denied, although so many arrests have been made; and I have given this consideration to the point because it appears from the papers before . me that whatever offenses against the law have been committed, the only persons who have invariably suffered therefor are the drivers. They have been arrested and locked up from twelve to twenty-four hours, when the actual offense, if any, was committed by the parties who knowingly caused them to drive horses unfit for the work, and who might as easily have been punished under the provisions of the act.
But while it may be proper to discuss what constitutes an offense within the act of 1867, and even" while it may appear that arrests have been made without cause, it is not olear at all that against the proceedings of defendants’ agents in the future, so far as the authority to arrest is concerned, any injunction could be issued which would not wholly destroy the objects of the statute and the purpose of the Society for the Prevention of Cruelty to Animals. It has been shown that the agents of that society have power to arrest, without warrant, offenders against the provisions of the act where the offense is committed in the presence of the person making the arrest. I can make no order restraining the arrests generally ; because a proper cause for making them may arise. The plaintiffs urge that inasmuch, as they allege, and the defendants do not deny, that their horses' always leave the plaintiffs’ stables in good condition, and that all the plaintiffs’ horses are now sound and able and fit to work, the *66 defendants should be enjoined from any arrests of the driver from this time. It is an answer to that application to say, that in the nature of things there is no certainty that such a state of facts will continue, for it is not incapable of change from day to day ; and so far as the condition of the horses, their proper treatment, and relative ability to work is concerned, they are all questions dependent upon professional opinions and are subjects upon which the greatest difference of opinion may exist. I have indicated what I deem to be the principles for guidance in determining whether offenses are committed against the statute or not, as matter involved in the construction of the statute. The enforcement of the law is largely committed to the defendants, and their serviceable work cannot be stopped. The injunction prayed for as to the arrests of the drivers or employees of the plaintiffs must therefore be denied.
As to the other branch of the relief asked, viz: an order restraining the defendant^ from interfering with the property of plaintiffs, an order to that effect should be granted. No authority is given to defendant or its agents to stop the stages of the plaintiffs for the purpose' of examining the horses to discover in what condition they are, or whether any offense is being committed in driving them, nor for any purpose except to arrest the drivers where it is perfectly clear and plain that he is guilty of a patent violation of the law. Neither have defendants or its agents any authority to take charge of the horses or vehicles in any case, or to send them to the stables, or to assume any authority or control over them, or to interfere between the driver and his passengers, or to require any fares to be paid back, or to do any of the acts of a similar nature charged in plaintiffs’ papers; the power of defendants’ agents being wholly confined to the making of arrests, and extending no further.
*67 An order may be settled on notice of two days by either party
II. Motion for an attachment against Henry Bergh for alleged contempt and violation of the order entered as above directed. The facts appear in the opinion following.
C. F. Wetmore, for the motion.
Elbridge T. Gerry, opposed.
J. F. Daly, J.
The contempt alleged is the violation by Mr. Bergh of the injunction order of the court made in this action January 15, 1873. By that order Mr. Bergh and the defendants were enjoined from stopping plaintiff’s stages and arresting drivers, except for a plain and patent violation of section 1 of the act of 1867, chapter 375, for the prevention of cruelty to animals. On April 7,1873, Mr. Bergh stopped a stage of plaintiff’s line in Broadway and arrested the driver. One of the horses attached to the stage was lame, covered with perspiration, with a scratch or soreness on the leg. A veterinary surgeon, who was present when the arrest was made, testifies that the horse was suffering pain, and limped badly, and was not in a condition to work. On the other hand, it was shown that the horse was fit to drive the next day, and has been driven ever since. There was no dispute as to the lameness of the horse when the arrest was made. The horse was not being driven for exercise, because it was drawing the stage with passengers, in the regular course of plaintiff’s business. Whether that work was beneficial as exercise is not a question to be determined here. It appears that, as matter of judgment of experts, the horse was suffering when the arrest was made. The stopping of *68 the stage was to make the arrest, there being in the sound judgment of Mr. Bergh and others, experts, ground for believing an offense to be committed under the act in question. The driver was imprisoned and tried at the special sessions, but acquitted, the judges having doubt of his guilt; and he was required to produce evidence in his defense, the prosecution making out, in the judgment of that court, a prima facie case. Whether the arrest was proper or not is not altogether the question to be considered now, the driver having his remedy in a court of law for damages, and the plaintiffs having their action of trespass. The point is, whether Mr. Bergh has been guilty of "a willful violation of the order of injunction made by this court. I think the evidence on this motion shows that he has not. It must be remembered that the agents of the Society .for the Prevention of Cruelty to Animals are charged by law with the execution of the provisions of the act of 1867. They cannot, therefore, be punished in this summary manner, unless the proofs show that, in a case where there is no doubt that no offense was committed, they nevertheless interfered with the plaintiffs’ franchise to make the arrest. Where they have on conceded facts clear evidence on which to base a sound judgment that the offense is committed, they will not be punished as for a'contempt, and the plaintiffs must be left to their legal remedy.
Dennis Christie, the driver mentioned in the last preceding case, sued Henry Bergh, in the marine court, for false imprisonment, and obtained an order of arrest against his person. Bergh moved to vacate. The facts appear in the opinion.
Elbridge T. Gerry, for the motion.
C. F. Wetmore, opposed.
*69 Shea, C. J.
This is a motion to vacate an order of arrest. It has been heard upon the complaint and upon affidavits read by each party in his own behalf respectively.
The decisive point of contention upon the argument of this motion relates to the legality of the power exercised by the defendant to arrest, or cause the arrest of, certain offenders charged with misdemeanors, and to do so without written warrant. This was conceded on the argument by both counsel; and it is, therefore, important, and perhaps controlling, that the scope of this action itself is limited by the contention on the part of the plaintiff that the wrong complained of was false imprisonment and not malicious prosecution. Unless there has been an unauthorized arrest the action cannot be maintained.
The objection was not suggested upon the hearing, that where the action is founded upon averments of wrong and not upon contract, the merits of the case cannot be tried upon a motion to discharge the order of arrest, but should be tried as of the issues in the action; and, undoubtedly, this must have been left unsuggested as an objection herein, because the motion really goes to the very right of action in the plaintiff, and not to the fact and circumstances of the arrest. Such cause of action is generally not to be decided by a hearing upon affidavits; yet where, as here, the form and gist of the action is conceded by each party, the fact is sufficiently presented for a court to adjudge whether the right of action, as it exists by the averments in the complaint and this concession on the hearing, can be maintained.
Before the mere forms of action were abolished by the Code of Procedure, the present would have been in form an action of trespass. Malicious prosecution would have taken the form of an action on the case. While the forms of action are abolished, still they serve *70 as very accurate and intelligible guides to the consideration of the strictly legal merits of such a law question as is now under advisement. A case of malicious prosecution can be maintained where, without probable cause, and with malice, the law is used wrongfully to restrain by its process the liberty of another"person ; the gist of such an action is the want of probable cause and the existence of malice. But false imprisonment is, where the restraint of personal liberty is utterly without warrant or prescription of law ; without “ due process of law,” as it is most usually expressed: the gist of such an action is the unlawful taking of the person into custody. In the first “the question always turns upon this, Was the arrest dona fide? Was the act done fairly and in pursuit of an offender, or by design, malice or ill-will ? . . . Many an innocent man has and may be taken up upon suspicion; but the mischief and inconvenience to the public- in this point of view is comparatively nothing; it is of great consequence to the police of the country ” (Lord Mansfield, in Ledwith v. Catchpole, Caldecott's Cases, 291). In the second, the power to make the arrest at all, is denied.
The single question now before me for consideration, therefore, is: Had the defendant, at the time of the arrest of plaintiff, power given to him, by competent lawful authority and in an official capacity, to place the plaintiff under such an arrest and detention ?
These are the facts : The plaintiff is a driver of a public stage, and on April 7, 1873, while he was engaged in his business as driver, the defendant called a policeman to him, and, in a public street in this city, directed that officer to take the plaintiff immediately and without further or other warrant into custody; charging that the driver was then in the act of over-driving a horse which appeared at that time to be incapable of doing the work imposed, and that this *71 overdriving was in such a manner as to incur the offense of cruelty to the animal, and was within the act for the prevention of those offenses. The plaintiff was then taken by that officer before a committing magistrate at the Jefferson Market police court; was there, on a charge lodged by defendant himself, commited by the magistrate to answer for driving a horse attached to an omnibus, the horse then being in a completely lame condition (Laws of 1867, ch. 375, § 1).
The case was then tried at the special sessions. After many witnesses had been examined on the part of the people and of the accused, the defendant being one of the witnesses for the prosecution, the plaintiff was acquitted of the charge. By the affidavits read by the plaintiff on this motion he denies that he was guilty of any cruelty to the horse, and denies that the horse was lame or unfit for the work ; and other evidence was read tending to prove the truth of' these denials. The defendant justifies his own action on that occasion by several statutes of the State of New York, especially one entitled “An act better to prevent cruelty to animals,” passed April 19,1866 ; another, entitled “An act for the effectual prevention of cruelty to animals,” passed April 12, 1867; and the duty and power conferred upon “The American Society for the Prevention of Cruelty to Animals” (Laws of 1866, ch. 469, passed April 10, 1868), its members and agents; of which society the defendant is now, and was at the time of that arrest, the president; and he insists that, in directing the officer to take the plaintiff into custody and in making the charge upon which he was subsequently tried, the defendant was acting in the performance of duty and within the limits of bis official powers. The act complained of is thus confessed to have been by the direct procurement of the defendant. Had he authority by law to do this thing and in the manner in which he directed it to be done ?
*72 The rule of the common law is, beyond a doubt, that while a constable has power to arrest without warrant on the charge of a third person in cases of felony, he has no such power in cases of misdemeanor after the offense has been committed : “ Suppose a constable is told that a misdemeanor has been committed he has no power to arrest. The power to apprehend on suspicion is confined to cases of felony” (Martin, J., in Griffin v. Coleman, 4 N. & H., 270), and this rule must be applied in accordance with the definitions of felony and misdemeanor at common law, except where and as the statute law has clearly and specifically altered that rule. This distinction is obviously founded upon the difference in the enormity of the offenses, and upon the policy that greater expedition might be necessary to secure the offender in cases of felony than in those of misdemeanor. What power, if any, has the defendant above that inherent in other private citizens to do this act complained of? The offense imputed was merely a misdemeanor; and therefore the rule of the common law, whicli does not permit such an arrest by constable or private person, should prevail; but that that rule has been superseded, in this very classification of misdemeanors, by positive statutes.
The authority to make such arrests has been conferred by statutes upon the members and agents of that society, and it is clear to me that the defendant, in procuring the arrest of the plaintiff at the time and in the manner stated, was doing an act within the intent of the official duty and power delegated to him. I speak now and here of the authority itself—not of its abuse.
And first, as to the public officer. I find his power to make such arrests in section 8 of the act to establish a metropolitan police district (Laws of 1857, ch. 569), whereby the members of the police force of the district are given “in every part of the State of ¡New York, all the common law and statutory powers of constables, *73 except for the service of civil process;” and in the amendatory act (Laws of 1860, ch. 256), declaring in section 28 that the members of the police force " ‘ shall possess in every part of the State all the common law and statutory powers of constables, except for the service of civil process” (see also Laws of 1870, ch. 137, §§ 56, 57, as amended by Laws of 1870, ch. 383, § 23). Judge Woodruff, in Burns v. Erben, 40 N. Y., 463, after remarking that the appeal in that case had been taken upon a misapprehension of the construction and effect .of the statutes conferring power upon the policeman, continues, “I think the power perfectly clear, and I notice that the rules and regulations of the board of police are in conformity therewith, and it is made the duty of the officer to take the arrested person immediately before the police court,” &g. To be sure, the'particular charge in that case was of felony, but the court were discussing the subject of arrest without warrant in its general reason and necessity.
And, second, as to the power of the defendant officially, as an agent of the society, and in like cases as that under consideration, to direct and participate in arrests for those offenses. This power is to be found in the Laws of 1867, ch. 375, § 8 : “Any agent of the American Society for the Prevention of Cruelty to Animals, upon being designated thereto by the sheriff of any county in this State, may, within such county, make arrests and bring before any court or magistrate thereof having jurisdiction, offenders found violating the provisions of this act,” &c; And then, in conjunction with the sections concerning the police which I have referred to, is to be read that which, in a compendious manner, declares the relative duties of the police and the members and agents of the society in these proceedings : “The police force of the city of New York, as well as of all other places where police organiza *74 tions exist, shall, as occasion may require, aid the society, its members or agents, in the enforcement of all laws which are now or may hereafter be enacted for the protection of dumb animals” (see the charter of the society, Laws of 1866, ch. 469, § 7).
These several statutes have effectively superseded the rule of the common law, and have enabled the society, directly by its members and agents, or indirectly through the aid of police, to make such arrests.
The police are directed to act “in aid” of the execution of original authority and “as occasion may require.” The occasion which may require the intervention of the police force would be merely to preserve the public peace, and secure the prisoner (Derecourt v. Corbishery, 5 Ellis & B., 192; Campbell, Ch. J. and Earle, J.).
This power to arrest offenders chargeable with misdemeanor merely, and without a warrant, is not exceptional in our statutory law. It is conferred upon the officers of the metropolitan police: “The several members of the police force shall have power and authority to immediately arrest without warrant, and to take into custody, any person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace or offense directly prohibited by act of the legislature or by any ordinance of the city, town or village within which the offense is committed, threatened or attempted ; .... immediately upon such arrest, convey in person such offender before a magistrate of the city, village or town where the arrest is made that he may be dealt with according to law” (Laws of 1864, ch. 403, § 30) ; and in certain cases upon the capital police force (Laws of 1865, ch. 554, § 25); and also, upon officers of the Niagara frontier police (Laws of 1866, ch. 484, § 23); and in other instances this special power was re-enacted. But where the arrest is *75 made without a warrant the officer or person making the arrest must “ immediately and without delay ” take the prisoner before a magistrate that he may take such proof as may be offered ; or. if circumstances require, hold the prisoner for further examination (Schmeider v. McLane, 4 Abb. Ct. App. Dec., 154; S. C., 3 Keyes, 568).
The power to make the arrest being clear, then the gist, the essential prerequisite, of an action for a false imprisonment, is not presentable in this case, and this cause of action cannot be maintained. The action is brought upon a denial of the power to arrest; the law itself is the sufficient answer to this denial.
There is nothing averred as to there being any unreasonable or abusive exercise of the power. An action founded on that averment could be maintained in law. The distinction between the existence of a power and the unreasonable and oppressive use of the power, should be too obvious to require me to do more than suggest it. It is elementary in its nature, and can be illustrated lóy a reference to many reported cases. An instance is where a constable executed a warrant in an oppressive manner, and with the avowed design to vex and harass the debtor; “ for where the oppression and malice are charged as the gist of the action, and are clearly made out, the action on the case will lie. If he be charged with a malicious and oppressive proceeding, the proper remedy for the abuse of power is a special action on the case, in which the malice and the oppression must both be made manifest ” (Rogers v. Brewster, 5 Johns., 126, and cases there cited). The principle is stated to be “ that where it could be shown that one man had causelessly and maliciously exercised over another, to his damage, powers incident to his situation of superior, a special action on the case ’ ’ can be maintained. Because this would not be the performance of duty, but the indulgence, of maliciousness. Perhaps as pertinent as this is the case against a collector, where *76 the libel was dismissed, and wherein it was held that he was not a trespasser, but liable only for an abuse of authority (Van Brunt v. Schenck, 13 Johns., 415). In these and like cases the conduct of the ministerial officer was in the original taking lawful—that is, in the original capture and detention of the prisoner the act had the form of law, was within the province of power, and, in the performance, formally, of official duty. The arrest being made within the jurisdiction thus conferred, all intendment and presumption of law must be in favor of its reasonable, orderly and just administration in this instance. Public policy demands that a public agent of the law shall be presumed, until the contrary clearly and strongly appears by competent proof, to have been acting within a power which for public purposes has been conferred upon him. Yet the law will not, in its executive capacity, work unnecessarily a wrong; for, on the other hand, as we have also seen, if an individual, under color of the law, does an illegal act, or if he abuses the process of the law to make it an instrument of oppression or extortion, this is a fraud upon the law, by the commission of which liability will be incurred. Any other construction would defeat the efficacy and operation of these remedial laws, while this, which the- reason and object of them force upon my acceptance, gives full effect and protection to the relative and reciprocal rights of the individual and of the public.
The suggestion of counsel at the hearing, that the decision of this question is important, in-cases frequently arising now under these statutes, has led me into this exposition of the law. I have done so in the hope that the relative duties and rights of the society, “its members and agents,” and those of others of the public at large, may be better understood than they seem to be, and enforced, and intelligently obeyed— that factious resistance to the law itself may be dimin *77 ished, and any oppressive or vexatious administration of its provisions restrained. It is not correct to assert that the policy of this kind of legislation, especially that which has for its purpose the prevention of cruelty to brutes, is a regulation of the dominion of the private citizen over his own private property merely. It truly has its origin in the intent to save a just standard of humane feeling from being debased by pernicious effects of bad example—the human heart from being hardened by public and frequent exhibitions of cruelty to dumb creatures, committed to the care and which were created for the beneficial use of man.
Hogarth, a great instructor in the subtle influence of example upon human conduct, points the moral of, and need for, such laws, in one of his many series of eloquent sketches, wherein he delineates the demoralizing tendency of evil example by tracing, in several progressive degrees of crime, the education of the criminal from an instance of reckless, perhaps thoughtless, cruelty, done by the boy to a domestic animal in the public street, ending at length in an act of murder. And who that has read of it, as related by Boper, can forget the conduct of Sir Thomas More, himself a judge and legislator, who esteemed it among the more efficacious of his parental duties to encourage his children to-take into their protection some domestic animal and foster it with provident care. Perhaps from such early practical lessons of kindness the noble filial piety and tender character of his daughter Margaret drew into her nature some of those virtues which graced her life.
It is to this persuasion and principle that we are indebted for nearly all laws against those acts of man which tend to bring before others an evil example, and which offenses are described as being against public policy or economy. Hence obscene prints and lewdness, prize fighting, whether of dogs, other brutes, or *78 men, are, together with public drunkenness, classed by elementary law-writers under the same classification of misdemeanors as that of cruelty to animals. These constitute, by example, “ a breach and violation of the public rights and duties, owing to the whole community, considered as a community, in its social aggregate capacity,” and though “of consequence, private vices or the breach of mere absolute duties, which man is bound to perform considered only as an individual, are not, cannot be, the object of any municipal law yet when by “ their evil example or other pernicious effects they may prejudice the community, they thereby become a species of public crimes. Thus the vice of drunkenness, if committed privately, is beyond the knowledge, and, of course, beyond the reach of human tribunals; but if committed publicly, in the face of the world, its evil example makes it liable to temporal censures.” In the prevention of these and like transgressions of public decency and good order the community is deeply interested ; and it is safer to asseverate that this legislation relating to the prevention of cruelty to animals is to protect man himself rather than the brutes named as its beneficiaries ; for even the game laws, though formed to preserve the game for their primary object, yet the ultimate object is, that the game may be increased and preserved for the benefit of man.
Having now considered this case as fully as required (perhaps as fully as desirable), T am unable to discover any legal reason upon which the order of arrest granted herein can be upheld in law ; and I am, as I have already stated, of the opinion that this action, being founded on the assumption of an unauthorized imprisonment, cannot be maintained on that ground. Wherefore an order will be entered vacating that order of arrest and discharging the defendant, Mr. Henry Bergh, from custody.